IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                                    CRIMINAL 09-0096 (DRD)

[3] GABRIEL FRANKI-IRIZARRY, et
al.,

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on defendant Gabriel Franki-Irizarry's Motion

to Dismiss and/or Suppress Evidence filed on April 20, 2009.  (Docket No. 52.)

The United States filed a response on June 12, 2009.  (Docket No. 86.)  For the

reasons set forth below, it is recommended that defendant's motion be DENIED.

I.       Factual and Procedural Background

        The following facts are derived from the complaint and accompanying

affidavit signed by Immigration and Customs Enforcement ("ICE") Special Agent

Francisco J. Gregory (the "complaint affidavit"), (Docket Nos. 3; 3-2), the affidavit

submitted by Special Agent Gregory pursuant to an Application for a Search

Warrant, (Docket No. 52-2), the defendant's motion, (Docket No. 52), and the

government's response.  (Docket No. 86.)  In January 2009, Drug Enforcement

Administration ("DEA") agents assigned to the Carribean Corridor Strike Force

("CCSF") learned from a source of information ("SOI") that a sea vessel named

CRIMINAL 09-0096 (DRD)                    2

the Black Sea would be utilized at some point to smuggle narcotics into Puerto Rico.  (Docket No. 52-2, at 3, ¶ 4.)  The Black Sea is a Viking brand 54 foot yacht owned by MDS Caribbean Seas, Ltd. and registered in the British Virgin Islands. Around 10:30 p.m. on February 24, 2009, Customs and Border Protection ("CBP") Air Interdiction Agents observed a sea vessel heading east of the south coast of Puerto Rico, "outside U.S. territorial waters." (Id. at 4, ¶ 7.)  The parties agreed that the boat was traveling through rough seas, and according to the government, "the vessel was traveling at high speeds."   (Docket No. 86, at 2, ¶ 3.)  A CBP Marine Unit was directed towards the vicinity of the vessel, and it ultimately made visual contact with the Black Sea as it entered the Palmas del Mar Marina in Humacao, Puerto Rico.

CBP Marine Interdiction Agents ("MIA") stopped the Black Sea at a pier within the Marina at approximately 2:00 a.m. on February 25, 2009. (Docket No. 52-2, at 4, ¶ 7.)  The agents identified and interviewed four men on board, defendants Walter Andujar-Aponte, Moisés Cardona-Pérez, Antonio Rodríguez-Sorrienti, and Gabriel Franki-Irizarry.  There is no indication that any of the four men were placed under arrest at this time, nor is there any indication that they were read their rights under Miranda v. Arizona, 384 U.S. 436 (1966).  Andujar-Aponte identified himself as the vessel's captain.  (Id.)  According to both the complaint affidavit and the warrant affidavit, Andujar-Aponte stated that the men

CRIMINAL 09-0096 (DRD)                    3

had been fishing approximately twenty-five miles off the coast of Puerto Rico.

(Docket No. 3-2, at 1, ¶ 5; Docket No. 52-2, at 4, ¶ 7.)  This is consistent with the

warrant affidavit's averment that the vessel was initially observed "outside U.S.

territorial waters."[1]    (Docket No. 52-2, at 4, ¶ 7.)

     One crew member said that the vessel had departed from La Parguera,

Puerto Rico, while another said it had departed from Ponce, Puerto Rico.

According to the government, Andujar-Aponte initially stated the crew had come

from La Parguera, but later stated they originated in Cabo Rojo, Puerto Rico.

(Docket No. 86, at 2, ¶ 4.)  In light of these discrepancies, the CBP officers opted

to conduct a sweep of the boat with a K-9 named Hugo.  (Docket No. 3-2, at 2,

¶ 5; Docket No. 52, at 6, ¶ 1.)  According to U.S. CBP division of the Department

of Homeland Security, Hugo is "reliable in the detection of substances" including

cocaine.  (Docket No. 86-3.)  The CBP division states that "[i]t is recommended

that [teams including Hugo] be routinely used in all work environments."  (Id.)

Upon inspecting the vessel, Hugo "had a positive hit in the master bedroom deck."

(Docket No. 3-2, at 2, ¶ 5; Docket No. 52, at 6, ¶ 1.)  The CBP Contraband

Enforcement Team thus proceeded to conduct a search of the vessel, but had

found no contraband by the time the agents concluded the search in the morning

_____

     [1] Per Presidential proclamation, the United States territorial waters extend
twenty-four miles beyond the shore.  Proc. No. 7219, 64 Fed. Reg. 48,701 (Aug.
2, 1999); United States v. de León, 270 F.3d 90, 91 (1st Cir. 2001).

CRIMINAL 09-0096 (DRD)                    4

hours of February 25, 2009.  The government states that the crew members were free to leave at this point, and defendants do not contend otherwise.  (Docket No. 86, at 3, ¶ 4.)

On February 26, 2009, a group of agents from ICE, CCSF, and CBP returned to the Black Sea.  The government contends that only two of the four defendants were present at that time: Andujar-Aponte and Cardona-Pérez.  (Docket No. 86, at 3-4; Docket No. 3-2, at 2, ¶ 6.)  The government states that Franki-Irizarry was "not present when [the] agents returned on February 26, 2009 or in the next several days as the search continued."  (Docket No. 86, at 9, ¶ 3.)  Defendant does not contend otherwise.  In all events, CBP officers informed the crew that the proper border entry requirements had not been completed for the vessel, and the agents proceeded to begin searching the boat again.  In the master bedroom of the cabin agents found ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes.  (Docket No. 52-2, at 4, ¶ 8.) The affidavit states that these items were "consistent with recent seizures made on pleasure vessels used to smuggle narcotics."  (Id. at 4-5, ¶ 8.)  No narcotics were found on this day, however, and the search concluded at 8:00 p.m.

The following day, February 27, 2009, MIA and CBP officers contacted Andujar-Aponte and requested that he and his crew be present at the vessel for

CRIMINAL 09-0096 (DRD)                    5

another inspection.  Andujar-Aponte stated that he would not return to the vessel.  (Docket No. 3-2, at 2, ¶ 7.)  The government contends that none of the four defendants ever returned to the vessel and neither the complaint affidavit, the warrant affidavit, nor defendant's brief states otherwise.  (Docket No. 86, at 4.)  MIA officers transported the vessel to Marina Puerto del Rey Marina and placed it in dry dock.  The agents received further information corroborating their initial SOI that narcotics were aboard the vessel, but concluded the investigation on that day without finding any contraband.

Another more invasive search took place on February 28, 2009.  According to the defendant, customs agents "destroyed the ceilings, the bathrooms, the doors, drilled holes in the fuel tank, drilled holes in other tanks, cut holes in the walls, broke the beds, broke the seats, removed the doors, many systems made unusable [sic], etc."  (Docket No. 52, at 2.)  The search was unavailing.  No search took place on Sunday, March 1, 2009, and the agents were nearing conclusion of their search on March 2 when they received further information indicating that narcotics were aboard the vessel.  Based on the facts and information obtained to that point, CCSF Agents applied for a search warrant to perform a more invasive search of the vessel.  (Docket No. 52-2.)  The warrant was signed on March 3, 2009.  On March 4, CCSF agents and CBP officers resumed the search and found a total of two hundred eighty-eight kilograms of

CRIMINAL 09-0096 (DRD)                    6

cocaine packed behind shower stall fixtures in the two bathrooms within the vessel.  (Docket No. 3-2, at 2, ¶ 10; Docket No. 86, at 5-6; Docket No. 86-4.)

On March 5, 2009, CCSF agents obtained a criminal complaint against and warrants for the arrest of the defendants.  At approximately 6:00 p.m. that day, defendant Franki-Irizarry self-surrendered to federal agents in Joyuda, Puerto Rico.  (Docket No. 86, at 6.)  He was immediately transferred to the CBP facility in Aguadilla, Puerto Rico, where he was informed of his rights and signed a form waiving those rights.  He stated that he was responsible for cleaning the Black Sea and had never been outside of Puerto Rico aboard the vessel.  The government contends, however, that according to CCSF agent investigation, the Black Sea arrived in La Romana, Dominican Republic, on February 14, 2009, and that Franki-Irizarry had been on board the vessel at that time.  (Docket No. 86, at 6.) According to the government, he was also on board the vessel when it departed from the Dominican Republic.  The government states that a GPS device aboard the Black Sea demonstrates that a trip to the Dominican Republic in February 2009 had been planned for the vessel.    (Docket No. 86, at 7.)  According to information evidently available on the device, the vessel was headed to that country, but the device was turned off on February 14, 2009.  In any event, Mr. Franki-Irrizary was arrested on March 5, 2009 and appeared before a magistrate judge on the afternoon of March 6, 2009.

CRIMINAL 09-0096 (DRD)                    7

A federal grand jury returned a seven-count indictment against the four defendants on March 11, 2009.  (Docket No. 17.)  Defendants are charged with knowingly and intentionally possessing with intent to distribute five kilograms or more of a substance containing cocaine, a Schedule II Narcotic Drug Controlled Substance.  21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 846; 18 U.S.C. § 2.  They are also charged with conspiring to import and importing the same into the United States.   21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B), 963; 18 U.S.C. § 2.  Finally, they are charged with possession of a controlled substance on board a vessel subject to the jurisdiction of the United States and with conspiring to do so. 46 U.S.C. §§ 70502(c)(1)(D), 70503(a)(1), 70504(b)(1), 70506(b); 18 U.S.C. § 2.  The government seeks forfeiture of assets upon conviction.  21 U.S.C. §§ 853, 881; 46 U.S.C. § 70507.

Defendant Franki-Irizarry seeks dismissal of the importation charges against him under 21 U.S.C. § 952(a); suppression of evidence obtained through a warrantless search; suppression of evidence gathered through a warrant that was obtained in violation of the Fourth Amendment, United States Constitution; a hearing regarding the same under Franks v. Delaware, 438 U.S. 154 (1978); suppression of statements by defendant allegedly obtained in violation of the Fourth and Fifth Amendments, United States Constitution; a finding that the government violated Rule 5 of the Federal Rules of Criminal Procedure by

CRIMINAL 09-0096 (DRD)                8

unnecessarily delaying his appearance before a magistrate judge; and, a finding

that he does not qualify as an expert witness regarding the painting or repair of

boats pursuant to Rule 702 of the Federal Rules of Evidence.

II.    DISCUSSION

A.    Standing Under the Fourth Amendment

The Fourth Amendment of the United States Constitution provides that:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause, supported
> by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be
> seized.

U.S. Const. amend. IV.   "It is 'well settled that a defendant who fails to

demonstrate a legitimate expectation of privacy in the area searched or the item

seized will not have 'standing' to claim that an illegal search or seizure occurred.'"

United States v. Vilches-Navarrete, 523 F.3d 1, 13 (1st Cir.), cert. denied, 129 S.

Ct. 208 (2008) (citing United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993)).

In order to make such a demonstration, a defendant bears the burden of showing

that "he had both a subjective expectation of privacy and that society accepts that

expectation as objectively reasonable."  United States v. Vilches-Navarrete, 523

F.3d at 13 (citing California v. Greenwood, 486 U.S. 35, 39 (1988)); cf. United

CRIMINAL 09-0096 (DRD)                 9

States v. Scott, 975 F.2d 927, 928 (1st Cir. 1992); see United States v. Sánchez, 943 F.2d 110, 113 (1st Cir. 1991).

Generally speaking, "a crew member cannot have an expectation of privacy in a space that the Coast Guard is free to inspect in the course of a document and safety check." United States v. Cardona-Sandoval, 6 F.3d 15, 22 (1st Cir. 1993). However, "cases involving substantial vessels, such as cargo ships and freighters, must be distinguished from . . . small pleasure craft used for fishing." Id. (finding that a four person crew "possessed a reasonable expectation of privacy in all areas of the vessel," a forty-three foot fishing boat). This is because "[i]n such a [small] vessel there are no 'common areas' in the same sense that the cargo hold or dining room on a large boat are public or common. The fact that several individuals may share the limited space no more makes the space public than would the fact that a family may share a house or a hotel room." Id.

Much like the boat in Cardona-Sandoval, the Black Sea was a pleasure craft, evidently equipped for fishing, with four individuals on board. It was only eleven feet longer than the vessel in Cardona-Sandoval. In light of these striking similarities, Cardona-Sandoval is controlling. As a crew member of a smaller pleasure craft, Franki-Irizarry had an expectation of privacy aboard the Black Sea, and therefore had standing to raise a challenge under his Fourth Amendment rights for as long as he remained with the boat.

CRIMINAL 09-0096 (DRD)                    10

Franki-Irizarry did not, however, retain that standing throughout the multi-day search of the boat.  "[T]he act of abandonment extinguishe[s] [a defendant's] Fourth Amendment claim." United States v. Sealey, 30 F.3d 7, 10 (1st Cir. 1994) (no expectation of privacy in firearm, magazine and ammunition that defendant discarded as he fled police); see Abel v. United States, 362 U.S. 217, 241 (1960). "[W]hen an individual abandons property, he forfeits any reasonable expectation of privacy in it, and consequently police may search it without a warrant." United States v. Sealey, 30 F.3d at 10 (citing United States v. Lewis, 921 F.2d 1294, 1302 (D.C. Cir. 1990)).  Put another way, "[i]t is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant." United States v. de Los Santos Ferrer, 999 F.2d 7, 9 (1st Cir. 1993) (disclaimer of ownership of a suitcase at an airport constituted abandonment  and forfeiture of claim of privacy in its contents); see also United States v. Scott, 975 F.2d at 929 ("[A] person who places trash at a curb to be disposed of or destroyed by a third person abandons it because 'implicit in the concept of abandonment is a renunciation of any reasonable expectation of privacy in the property abandoned.'") (quoting United States v. Mustone, 469 F.2d 970, 972 (1st Cir. 1972) (footnote omitted)); cf. United States v. Moss, 887 F.2d 333, 334 (1st Cir. 1989) (giving consideration to narcotics found on a boat for purposes of pretrial

CRIMINAL 09-0096 (DRD)                    11

sentencing, where narcotics were found after defendant had abandoned ship and attempted to swim ashore).

    Here, it is uncontested that Franki-Irizarry did not return to the boat after the initial search of the vessel on February 25, 2009.  We "consider ownership, possession, control, ability to exclude from the premises, or a legitimate presence on the premises when determining the existence of a legitimate expectation of privacy." United States v. Cardona-Sandoval, 6 F.3d at 21 (citing United States v. Melucci, 888 F.2d 200, 202 (1st Cir. 1989); United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)).  As the crew member hired to clean the vessel, the defendant has demonstrated no ownership or ability to control the Black Sea. Further, by voluntarily leaving the vessel behind, Franki-Irizarry ceded any possession, ability to exclude from the premises, or legitimate presence on the premises he might otherwise have had.  Defendant cites Chapman v. United States, 365 U.S. 610 (1961) to support the argument that his presence was not necessary to retain a possessory interest in the vessel, and that he therefore maintained a privacy interest in it even after leaving it.  (Docket No. 52, at 19.) Chapman is inapposite, however, as it involved a tenant's possessory interest in his own apartment dwelling, something far more sacred than the interest of a low level crew member in a sea vessel owned by another.  Chapman v. United States, 365 U.S. at 615 ("The right of officers to thrust themselves into a home is also a

CRIMINAL 09-0096 (DRD)                    12

grave concern, not only to the individual but to a society which chooses to dwell

in reasonable security and freedom from surveillance.").  While Chapman held that

"one's house cannot lawfully be searched without a search warrant, except as an

incident to a lawful arrest therein," Chapman v. United States, 365 U.S. at 613

(quoting Agnello v. United States, 269 U.S. 20, 32 (1925)), there is no such

precept with respect to sea vessels.  See United States v. Victoria-Peguero, 920

F.2d 77, 80 (1st Cir. 1990) (approving of warrantless search aboard a sea vessel).

Thus, defendant's situation is better analogized to United States v. Sealey, 30

F.3d 7 (1st Cir. 1994); United States v. de Los Santos Ferrer, 999 F.2d 7 (1st Cir.

1993); and United States v. Scott, 975 F.2d 927 (1st Cir. 1992).  Defendant

abandoned the Black Sea and therefore lacked any privacy interest in it from that

point forward.  Accordingly, he has no standing as to any Fourth Amendment

claims arising subsequent to the initial search of the boat in the early morning

hours of February 25, 2009.

     B.    Warrantless Search

     Defendant contends United States Customs had no authority to inspect the

Black Sea without a warrant.  He argues that the CBP had no right to search the

vessel under the "border search" exception to the Fourth Amendment.

Defendant's argument merits consideration only until the time he abandoned the

vessel.  "The border search exception provides that routine searches of persons

CRIMINAL 09-0096 (DRD)                13

and effects at borders are permitted without the requirement of probable cause."
United States v. Momoh, 427 F.3d 137, 143 (1st Cir. 2005) (citing United States
v. Ramsey, 431 U.S. 606, 619 (1977)).  "Since the founding of our Republic,
Congress has granted the Executive plenary authority to conduct routine searches
and seizures at the border, without probable cause or a warrant, in order to
regulate the collection of duties and to prevent the introduction of contraband into
this country." United States v. Montoya de Hernández, 473 U.S. 531, 537 (1985)
(citing United States v. Ramsey, 431 U.S. at 616-17 (citing Act of July 31, 1789,
ch. 5, 1 Stat. 29)).  Statutory authority for the border search exception comes
from Section 1581 of United States Code Title 19:

> Any officer of the customs may at any time go on board
> of any vessel or vehicle at any place in the United States
> or within the customs waters . . . and examine, inspect,
> and search the vessel or vehicle and every part thereof
> and any person, trunk, package, or cargo on board, and
> to this end may hail and stop such vessel or vehicle, and
> use all necessary force to compel compliance.

19 U.S.C. § 1581(a); United States v. Zurosky, 614 F.2d 779, 787 n.7 (1st Cir.
1979); United States v. Victoria-Peguero, 920 F.2d at 80.

          Under the exception, officials may conduct an extended, warrantless border
search if "officials have reasonable certainty or a high degree of probability that
a border was crossed," United States v. Pérez-Rivera, 247 F. Supp. 2d 108, 115

CRIMINAL 09-0096 (DRD)                    14

(D.P.R. 2003), and if the search satisfies "the constitutional requirement of reasonableness."  United States v. Victoria-Peguero, 920 F.2d at 80.

The first issue is whether the agents in this case had "reasonable certainty" or "a high degree of probability" that a border was crossed.  "The sea boundary of the United States territory is a marine league (three geographic miles) from shore, Cunard S.S. Co. v. Mellon, 262 U.S. 100, 122 (1923), and comprises a border for fourth amendment purposes." United States v. Victoria-Peguero, 920 F.2d at 80 (citing United States v. Zurosky, 614 F.2d at 787 n.7) ("The three mile limit [off the U.S. coast] establishes the boundary of the territorial sea and is regarded as the border.")).  Here, the CBP and MIA initially spotted the Black Sea "outside U.S. territorial waters," that is, over twenty-four miles beyond the shore. (Docket No. 52-2, at 4, ¶ 7.)  At least one of the crew members told CBP officers that the men had been "fishing approximately twenty five (25) miles offshore." (Docket Nos. 3-2, at 1, ¶ 7; 52-2, at 4, ¶ 7; 86, at 2, ¶ 4.)  Defendant does not deny in his brief that the vessel was over three miles beyond the coast.  Finally, CCSF intelligence indicated that the Black Sea "was going to be utilized to smuggle narcotics *into Puerto Rico*."  (Docket No. 52-2, at 3, ¶ 4.)  The weight of this evidence was sufficient to establish a "high degree or probability" and even "reasonable certainty" that the Black Sea had crossed a border.

CRIMINAL 09-0096 (DRD)                    15

The CBP agents also operated under reasonable suspicion of criminal activity.  United States v. Montoya de Hernández, 473 U.S. at 537 (citing New Jersey v. T.L.O., 469 U.S. 325, 337-42 (1985) ("What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.")).  While reasonable suspicion may develop prior to government agents' boarding a vessel, suspicion may also "be formed on the basis of facts obtained during the safety and document inspection. . . ." United States v. Cardona-Sandoval, 6 F.3d at 23.  The evidence demonstrates that the CBP agents operated pursuant to a reliable source of information that indicated the Black Sea was being used to traffic narcotics.  The agents observed that Black Sea was traveling at high speeds, in rough seas, at night.  After boarding the vessel, crew members delivered discrepant accounts of the boat's port of origin.  (Docket No. 52-2, at 4, ¶ 7.)  During the inspection, a K-9 gave a positive indication of the presence of cocaine.  Accordingly, the agents had reasonable suspicion that criminal activity was taking place.  See United States v. Montoya de Hernández, 473 U.S. at 542 (quoting New Jersey v. T.L.O., 469 U.S. at 346)  (sixteen hour extended border search was warranted where customs inspectors "had encountered many alimentary canal smugglers" and where "inspectors' suspicion" that defendant was such a smuggler was nothing more than a "'common-sense

CRIMINAL 09-0096 (DRD)              16

conclusio[n] about human behavior' upon which 'practical people,' –including government officials, are entitled to rely.").

Not only was the border search itself appropriate, but its location in the marina at Palmas del Mar was also justified.  "Because it is not practical to set up checkpoints at the outer perimeter of a country's territorial waters, courts have consistently recognized the constitutionality of warrantless searches at the functional equivalent of the sea border. . . . "  United States v. Victoria-Peguero, 920 F.2d at 80 (police boarding and search of vessel approximately 1.5 miles off the coast was appropriate) (citing United States v. Tilton, 534 F.2d 1363, 1365-66 (9th Cir. 1976) ("harbor as functional equivalent of border.")).  "The border search exception is not limited to searches that occur at the border itself but includes searches that take place at the 'functional equivalent' of a border. . . ." United States v. Momoh, 427 F.3d at 143.  The functional equivalent of a border includes a marina.  United States v. Thomas, 257 F. Supp. 2d 494, 497 (D.P.R. 2003) ("That the search occurred in the pier 10 area does not render it unreasonable, for it serves as the functional equivalent of the border.").  Here, it would not have been practicable for customs to set up a check point exactly at the three miles' distance from the coast, especially at night under rough seas.  A search in the protected Palmas del Mar marina was far more reasonable.  Thus,

CRIMINAL 09-0096 (DRD)                 17

under <u>United States v. Thomas</u>, the border search in that marina was appropriate under the Fourth Amendment.

C.     Search Warrant

Defendant next contends that the search warrant was invalid because a variety of statements within the warrant affidavit are allegedly unsupported or false.  (Docket Nos. 52, at 21, 52-2).  Defendant therefore requests a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). (Docket No. 52, at 22-23.) "A defendant is entitled to an evidentiary hearing under <u>Franks v. Delaware</u> where the defendant 'makes a substantial preliminary showing' that both (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" <u>United States v. Reiner</u>, 500 F.3d 10, 14 (1st Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 1737 (2008) (quoting <u>Franks v. Delaware</u>, 438 U.S. at 155-56).  Both elements are essential to establish the necessity of a <u>Franks</u> hearing.

Here, there is no need for such a hearing, as defendant cannot establish the second element.  There were at least two sound bases for finding probable cause to justify the search warrant, and defendant does not challenge the veracity or reliability of either.  First, the K-9 Hugo gave a positive indication of the presence of narcotics aboard the vessel.  According to the Department of Homeland

CRIMINAL 09-0096 (DRD)                18

Security, the K-9 was "reliable in the detection of [cocaine] . . . . " (Docket No. 86-3.)  A "positive alert from a canine sniff may be used as probable cause to obtain a warrant . . . . " United States v. Carreras, 851 F. Supp. 502, 505 (D.P.R. 1994) (citing United States v. Sokolow, 490 U.S. 1 (1989)) ("probable Cause [sic] to arrest individuals suspected of transporting illegal drugs in an airport may be proven with 'evidence of a strong alert by a narcotics dog [to the odor of drugs in a specific container], evidence that the dog was reliable and evidence linking the container to the individual arrested.'") (quoting United States v. Colón, 845 F. Supp. 923, 928 (D.P.R. 1994)).  As such, the evidence from the K-9 alone was sufficient to justify the search warrant and no other statement in the affidavit was necessary to the finding of probable cause. Defendant fails to contest the reliability or veracity of the dog's alert, and therefore fails to identify a false statement within the affidavit necessary to the finding of probable cause.

A second legitimate basis for issuance of the warrant was the affidavit's reference to the ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes.  (Docket No. 52-2, at 4, ¶ 8.)  "[T]he presence on the same premises of an unusually large number of zip lock plastic bags . . . combined with [an agent's] extensive experience as a law enforcement officer [may] plainly buttress[ ] the informant-based indicia of probable cause." United States v. Taylor, 985 F.2d 3,

CRIMINAL 09-0096 (DRD)                    19

6 (1st Cir. 1993).  Here, the presence of several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes is certainly unusual and appears inconsistent with defendants' ostensible reason for the sea voyage:  a fishing excursion.  The items are "consistent with recent seizures made on pleasure vessels used to smuggle narcotics," according to the warrant affidavit by ICE Special Agent Gregory.  (Docket No. 52-2, at 4-5, ¶ 8.)  Special Agent Gregory has been a Special Agent with ICE for seven years, and "the issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi."  United States v. Taylor, 985 F.2d at 6 (finding warrant affidavit sufficiently supported probable cause to search defendant's premises).  Much like the affidavit's averments as to the K-9, the allegation that various bags and deodorizing items were aboard the Black Sea was sufficient in itself to provide probable cause for a search warrant.  Defendant does not contest the veracity or reliability of that allegation, and he is therefore not entitled to a Franks v. Delaware hearing.

    D.    Importation Charge

        Franki-Irizarry also argues that the narcotics importation charge against him should be dismissed because the Black Sea did not come from a location outside the United States.  Section 952(a) of Title 21 of the United States Code, entitled

CRIMINAL 09-0096 (DRD)                    20

"importation of controlled substances," provides that "[i]t shall be unlawful to import into . . . the United States from any place outside thereof, any controlled substance . . . . " 21 U.S.C. § 952(a).  Defendant points out that "the importation statute does not apply to the shipment . . . from one part of the United States and its customs territory . . . to another."  United States v. Ramírez-Ferrer, 82 F.3d 1131, 1144 (1st Cir. 1996) ("a defendant can defeat an importation charge by demonstrating affirmatively by competent evidence that the drugs came into the United States directly from another place that is also within the United States.").  He argues that the Black Sea's course was from La Parguera, Puerto Rico to Palmas del Mar, Puerto Rico, and that the importation statute is therefore inapplicable.  (Docket No. 52, at 17.)  There is, however, a factual question as to the veracity of that claim.  While one Black Sea crew member told federal agents that the vessel's trip had originated in La Parguera, another stated that it originated in Ponce, Puerto Rico, and the vessel's captain allegedly stated at one point that it originated in Cabo Rojo, Puerto Rico.  The government, meanwhile, contends that the vessel in fact came from the Dominican Republic.  (Docket No. 86, at 7.)  In light of such an uncertain factual scenario, it cannot be said that defendant has demonstrated affirmatively by competent evidence that the drugs came into the United States from another place that is within the United States.

CRIMINAL 09-0096 (DRD)                    21

Accordingly, he has not established that the importation charge against him should be dismissed at this time.

E.     Suppression of Statements

Franki-Irizarry next argues that the statements he made to customs agents on February 25, 2009 should be suppressed under Miranda v. Arizona, because he was detained and unable to leave the area of the sea vessel.  (Docket No. 52, at 27.)

> [A] person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer Miranda warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

Stansbury v. California, 511 U.S. 318, 322 (1994) (citations omitted).  "It is well recognized that a routine inspection and boarding of an American flagship vessel . . . does not give rise to a custodial detention."  United States v. Vilches-Navarrete, 523 F.3d at 15 (quoting United States v. Elkins, 774 F.2d 530, 535 n.3

CRIMINAL 09-0096 (DRD)                22

(1st Cir. 1985)).  This is true even where defendants are "confined to one section of the boat during [a] lengthy Coast Guard inspection. . . . " <u>United States v. Elkins</u>, 774 F.2d at 535 n.3; <u>Unites States v. Nai Fook Li</u>, 206 F.3d at 83 (Coast Guard's boarding and inspection of ship with the crew's consent was not custodial in nature, even where crew was relegated to one section of ship) (citing <u>United States v. Rioseco</u>, 845 F.2d 299, 303 (11th Cir. 1988).

Here, the CBP agents boarded the Black Sea and performed a routine inspection.  Defendant claims that he and his co-defendants were not free to leave the vessel, but the same was true of the defendants in <u>United States v. Nai Fook Li</u> and <u>United States v. Rioseco</u> when they were relegated to a certain section of the ship.  The agents never placed any crew members under arrest, and defendant was free to go within hours of the vessel's being boarded.  Accordingly, Franki-Irizarry was not  in custody for purposes of <u>Miranda</u>, and his statements to CBP agents need not be suppressed.

F.     Delay Prior to Appearance Before a Magistrate

Defendant argues that he was subject to unnecessary delay after his arrest awaiting an appearance before a magistrate judge.  (Docket No. 52, at 27.)  He argues that Rule 5 of the Federal Rules of Criminal Procedure was violated because he was arrested on March 5, 2009 and did not face a magistrate judge until March 6.  Rule 5 provides that "[a] person making an arrest within the United

CRIMINAL 09-0096 (DRD)              23

States must take the defendant without unnecessary delay before a magistrate judge . . . . " Fed. R. Crim. P. 5(a)(1)(A).  The First Circuit has held, however, that "[t]he one day between the time [defendant] was arrested and when he was brought before the magistrate judge was reasonable, and the district court properly denied his motion to dismiss." <u>United States v. Vilches-Navarrete</u>, 523 F.3d at 15.  As only one day transpired in this case as well, <u>Vilches-Navarrete</u> controls and defendant was therefore not subjected to unreasonable delay under Rule 5.

    G.    Expert Testimony

    Lastly, defendant argues that he does not qualify as an expert with regard to the statement he gave to agents regarding the painting of sea vessels on March 5, 2009, and he contends that the statement should be suppressed. (Docket Nos. 52, at 30; 52-3.)  Defendant's argument, however, is premature. As the seminal case on expert witnesses, <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), held, "the Federal Rules of Evidence, . . . –especially Rule 702– do assign the *trial judge* the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert v. Merrel Dow Pharms., Inc.</u>, 509 U.S. at 597 (emphasis added).  It is thus for the trial judge to determine the suitability of testimony that allegedly involves witness expertise.  It would be anomalous for the government to seek to qualify the

CRIMINAL 09-0096 (DRD)            24

defendant as an expert in paint.  In any event, the statement is his.  See Fed. R. Evid. 801(d)(2)(A).

III.    CONCLUSION

For the reasons set forth, I recommend that defendant Franki-Irizarry's motion to dismiss and/or suppress evidence be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 21st day of August, 2009.

                                        S/ JUSTO ARENAS
                              Chief United States Magistrate Judge